## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**F. HARRISON GREEN,**

      **Plaintiff,**

    **v.**                       **Case No. 1:19–cv–14**
                                     **JUDGE DOUGLAS R. COLE**

**TIMOTHY A. MASON, et al.,**

      **Defendants.**

## OPINION AND ORDER

This action is before the Court on three motions: (1) Defendants Gary J. Bergenske and Jerry G. Gantt's Motion to Dismiss (Doc. 4); (2) Defendant Timothy A. Mason's Motion to Dismiss (Doc. 5); and (3) Plaintiff F. Harrison Green's Motion for Leave to File an Amended Complaint (Doc. 8). For the reasons explained below, the Court **GRANTS** Plaintiff's Motion for Leave to Amend his Complaint. The Court also finds, however, that, even as amended, the Complaint fails to state a claim, and thus the Court **GRANTS** Bergenske and Gantt's Motion to Dismiss, and **GRANTS** Mason's Motion to Dismiss, both of which the Court construes as directed toward the allegations in the Amended Complaint. Therefore, the Court **DISMISSES** the Amended Complaint **WITH PREJUDICE**.

## BACKGROUND

F. Harrison Green ("Green"), along with Timothy A. Mason ("Mason"), Gary J. Bergenske ("Bergenske") and Jerry G. Gantt ("Gantt" and collectively with Mason and Bergenske the "Defendants"), are all part of the fraternal organization Shriners

International, whose members are commonly referred to as "Shriners".[1] (Compl., ¶¶ 6–9, Doc. 1, #3–4[2]). Although known by many for their participation in local parades, Shriners are also involved in a variety of other endeavors, including the important task of operating the many Shriners Hospitals for Children across the country. (*See id.* at ¶¶ 8–9, 3–4). The Shriners Hospital for Children in Cincinnati (the "Hospital") is one such hospital. Green and Mason jointly served on the volunteer Board of Governors (the "Cincinnati Board") for the Hospital. (*See id.* at ¶¶ 6–7, #3). Their time together on that Board ultimately led to this suit.

In October 2015, Green was invited to join the Cincinnati Board as an Associate Member. (*Id.* at ¶ 13, #5). The following July, he was elected as a full board member, and he began his three-year term in that capacity in January 2017. (*Id.* at ¶ 15).

The Cincinnati Board is not the ultimate decision-maker regarding the Hospital. Rather, there are two national-level organizations, the Board of Directors of Shriners Hospitals for Children and the Board of Trustees of Shriners Hospitals for Children. (*See*, *e.g.*, *id.* at ¶ 8, #3-4). The Complaint refers to these collectively as the Joint Boards. (*Id.* at ¶ 18, #5). The Joint Boards decided in January 2018, just one year after Green assumed his position on the Cincinnati Board, that they were going to close the Cincinnati Hospital. (*Id.* at ¶ 20, #5). Days later, on February 5,

---

[1] As this action is before the Court on two motions to dismiss, the Court accepts the facts in Green's Complaint as true and resolves all reasonable inferences in his favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).

[2] Refers to PageID Number.

2018, the Joint Board allegedly forced the then-current Chairman of the Cincinnati Board to resign. (*Id.* at ¶ 17, #5). They then promoted Mason from Vice Chairman to Chairman, (*id.* at ¶ 18, #5), and named Green as Vice Chairman, (*id.* at ¶ 19, #5).

Later that same month, the Joint Boards changed course again and, instead of closing the Hospital, they decided to operate it with a "smaller footprint" either in its current facility or at another hospital. (*Id.* at ¶ 21, #6). In other words, the Joint Boards planned to make the Hospital a smaller "hospital within a hospital." (*Id.*). While the Complaint is not entirely clear on this point, it appears that Green alleges that actually closing the hospitals may have violated the bylaws of the Shriners Hospital for Children, but that this downsizing would not. (*Id.* at ¶ 23, #6).

The Joint Boards retained global consulting firm McKinsey & Company to explore the best means for implementing this downsizing, both in Cincinnati and at the three other Shriners Hospitals. (*Id.* at ¶ 22, #6). To facilitate this process, the Cincinnati Board formed a committee to work with McKinsey and the Hospital's staff. (*See id.* at ¶¶ 24–27, #6). Both Green and Mason served on this committee. (*Id.* at ¶ 24, #6). The committee's goal was to form a joint plan for reorganization, approved by both the Cincinnati Board and the Joint Boards, that it could present at "the Imperial Session of Shriners International." (*Id.* at ¶ 28, #7).

On April 25, 2018, the committee members presented a proposal for such a plan to the Executive Committee of the Cincinnati Board. (*See id.* at ¶ 29, #7). It was during this presentation that things began to go awry for Green. He alleges that during the presentation, Mason "sought to cut the presentation short," something

3

Green opposed in light of the time and effort he and others had put into preparing the pitch. (*Id.*).

Green further alleges that after the meeting, he and Mason confronted each other, and Mason "accused [Green] of using lawyer-like tactics by raising his voice and over-talking Mason," which Green denies. (*Id.* at ¶ 30, #7). Later that day, the "full" Cincinnati Board met; Green and his fellow committee members made "a second presentation which in part included" the plan they had proposed earlier that day. (*Id.* at ¶ 31, #7). The balance of the plan requested the authority to "assume the position of an affiliated hospita," a status that Green alleges "was available per the bylaws of Shriners Hospitals for Children and the Hospital Rules and Regulations." (*Id.*). During that second meeting, Green and Mason engaged in a robust discussion of whether the resolution was permissible under Shriner bylaws, with Green arguing in favor of the proposal's permissibility. (*Id.* at ¶¶ 32–34, #8).

A few weeks later, Green took it upon himself to email his proposal to one of the McKinsey consultants, Dr. Edward Levine. (*Id.* at ¶ 35, #8; *Id.* at Ex. A, Doc. 1-1, #18–19). In that email, Green reiterated his position that his committee's proposal "need[ed] to be explored" and that he hoped to "explore this option with" the consultants. (Compl. at Ex. A, #18). Dr. Levine responded two days later, thanking Green for his email but declining to get involved, as he did not want to be "'caught in the middle' of various conversations." (*Id.* at Ex. B, Doc. 1-2, #20).

Twelve days later, on May 22, 2018, the other two Defendants, Gantt and Bergenske, emailed Green and informed him that he was being relieved of his

position on the Cincinnati Board. (*Id.* at ¶ 37, #8; *Id.* at Ex. C, Doc. 1-3, #23–24). The emailed letter indicated that it had "come to the attention of the National Trustees" that Green violated Hospital rules and regulations by misrepresenting the bylaws to other board members, engaging in unauthorized meetings, and impermissibly communicating with Dr. Levine. (*Id.* at Ex. C, #23). The letter advised Green that "pursuant to Hospital Regulation §105.1 (a) (6), the Board of Trustees hereby removes you as the Vice Chairman and as a Member of the Board of Governors of the Cincinnati [Hospital]" and further notified Green that he was prohibited from entering Hospital grounds. (*Id.* at Ex. C, #23–24). Bergenske (the Chairman of the National Directors) and Gantt (the Chairman of the National Trustees) both signed the letter. (*See id.* at Ex. C, #24). Mason also received a copy in his capacity as Chairman of the Cincinnati Board. (*See id.*; *see also id.* at ¶ 37, #8).

Green alleges that the statements from the letter regarding his removal were "published" "through a community of membership in excess of 2,000 individuals." (*Id.* at ¶ 70, #14). He provides no further details as to this alleged "publication," although, in his proposed Amended Complaint (further discussed below), he expands on this slightly, claiming that the information was "contained in the records of Shriners International" (Prop. Am. Compl., Doc. 9, at ¶ 64, #104-05), and also that the statements were "found in public records and available via internet searches" (*id.* at ¶69, #106). He provides no further description, though, of the nature of the alleged "public records" or the specifics of any "internet searches" that would reveal the allegedly defamatory content.

Upset by this course of events, Green elected to sue Mason, Bergenske, and Gantt in their individual and official capacities. (Compl. at ¶¶ 7–9, #3–4). Green sued Bergenske and Green because of their authorship of the letter relieving him of his position on the Board of Governors. As for Mason, Green alleges that the only way Gantt and Bergenske could have learned about his alleged misconduct was from Mason. Indeed, time and again, Green asserts that Bergenske and Gantt did not have personal knowledge of his actions. (*See id*. at ¶¶ 43–51, #9-11). Other than whatever Mason told them, Green reiterates, he was "in good standing" before his removal and, aside from this one instance, had never been disciplined by any Shriners entity. (*Id*. at ¶ 40, #8).

On January 4, 2019, Green filed a Complaint alleging five causes of action under Ohio law.[3] The first two are for intentional and negligent infliction of emotional distress. (*See id*. at ¶¶ 57–67, #12–14). The third is for false light. (*Id*. at ¶¶ 68–72, #14). The fourth cause of action is for slander (*id*. at ¶¶ 73–78, #15), and the fifth appears to be for general "retaliation" (*id*. at ¶¶ 79–80, #16). Green seeks compensatory damages, punitive damages totaling $10,000,000, and attendant fees and costs. (*Id*. at ¶¶ A–D, #16).

## PENDING MOTIONS

In response to the Complaint, first Bergenske and Gantt (on March 20, 2019), and then Mason (on April 5, 2019), filed motions to dismiss under Rule 12(b)(6). (*See*

---

[3] This Court's jurisdiction is based on diversity (*see* Compl. at ¶¶ 6–9, #3–4), and the amount in controversy exceeds the jurisdictional amount (*see id*. at ¶ B, #16).

Defs. Bergenske and Gantt's Motion to Dismiss Compl. ("B&G's Mot."), Doc. 4, #28–46; Def. Mason's Mot. to Dismiss Pl.'s Compl. ("Mason's Mot."), Doc. 5, #47–60).

## A.   Defendants' Motions To Dismiss.

In their motion, Bergenske and Gantt argue that Green failed to state any viable causes of action. Bergenske and Gannt first attack Green's false light (Count III) and slander (Count IV) claims, arguing that neither claim is viable because "all communications [Green] has identified are protected under the common interest privilege," and further that Green failed to "identify any false statements made about him to third parties." (B&G's Mot. at #33). As to the latter, Bergenske and Gantt assert that Green's failure to identify any statement to serve as the basis for these claims makes them deficient as a matter of law. (*See id.* at #37–39). Moreover, Bergenske and Gantt argue that, to the extent Green is relying on the statements they made in the email they sent to Green, those statements are "not actionable" because (1) some of them cannot be verified as true or false (and thus they cannot serve as the basis for any type of defamation claim), and (2) the remainder are true (which is, of course, a defense). (*Id.* at #39–41). Finally, Bergenske and Gantt argue that Green failed to allege publication, a necessary element of both false light and slander. (*See id.* at #41–43).

Bergenske and Gannt then turn to Green's intentional infliction of emotional distress claim (Count I). They argue that this claim is not viable because Green failed to identify any conduct that satisfies the "extreme and outrageous" standard needed to support such a claim. (*Id.* at #43–44). At most, they argue, Green alleges certain

statements caused him "shock, embarrassment, and shame," all of which Bergenske and Gantt say is not enough. (*Id.* at 44). As for the negligent infliction claim (Count II), they argue Green failed to plead that he was cognizant of a physical danger to himself or another, and thus, that claim must fail too. (*Id.* at 45). Finally, they note that there is no general tort claim for "retaliation" under Ohio law, and thus that claim (Count V) should be dismissed, as well. (*Id.*).

Just a few days after Bergenske and Gantt filed their Motion, Mason likewise moved to dismiss the Complaint. (Def. Mason's Mot. to Dismiss Pl.'s Compl. ("Mason's Mot."), Doc. 5, #47–60). He largely echoes the arguments Bergenske and Gantt made in their Motion.

### B. Green Timely Opposed Bergenske and Gantt's Motion To Dismiss, But Not Mason's.

Green filed a timely response to Bergenske and Gantt's Motion on April 18, 2019. (Pl.'s Resp. to B&G's Mot., Doc. 6, #61–79). That opposition kicks off with a bit of a misstep, citing *Conley v. Gibson*'s outdated no-set-of-facts standard (*see id.* at # 65–66 (quoting *Bird v. Parsons*, 289 F.3d 485, 488 (6th Cir. 2001))), although Green ultimately acknowledges that the *Twombly/Iqbal* plausibility standard now governs a motion to dismiss. (Pl.'s Resp. to B&G's Mot. at #66). Despite that concession, the remainder of his response largely eschews "plausibility," in favor of a standard that focuses solely on "fair notice."

Having thus set the bar, Green principally responds by restating the allegations in the Complaint, specifically as to the slander and false light claims. (Pl.'s Resp. to B&G's Mot. at #67). As to Bergenske and Gantt's privilege claim, Green

argues that the common interest privilege can be "lost by the publisher's knowledge or reckless disregard as to the falsity of the defamatory statement." (*Id.* at #71). That happened here, Green claims, because Defendants lacked good faith and had "no innocent motive" in doing what they did. (*Id.* at #72). Green reiterates multiple times that Bergenske and Gantt "improper[ly] publish[ed] these false defamatory statements about Plaintiff, through a community of membership in excess of 2,000 individuals," and that because no privilege applies, he has pleaded plausible false light and slander claims. (*Id.* at #73–74). Finally, relying on, it seems, the same facts that support those two claims, Green argues he "has sufficiently [pleaded] emotional distress claim[s] against Defendants, both intentional and negligent." (*Id.* at #78). To this end, Green largely restates his good standing prior to this incident and his shock and embarrassment at being removed from the Cincinnati Board. (*See id.* at #78–79). Green does not respond to Bergenske and Gantt's argument on the retaliation claim.

While Green actively opposed Bergenske and Gantt's motion, he offered only silence in response to Mason's motion. It was not until this case was reassigned to the undersigned, and this Court set the matter for a status conference, that Green bothered to respond to that motion. His response came more than a year after the applicable deadline. (*See* Pl.'s Resp. to Mason's Mot., Doc. 14, #146–61). That being said, the response largely tracks, in most parts verbatim, Green's response to Bergenske and Gantt's Motion.

**C.    Green's Motion For Leave To Amend The Complaint.**

About two months after Defendants filed their motions to dismiss, and perhaps in response to the arguments raised in those motions, Green also moved for leave to amend his Complaint. (*See* Green's Mot. for Leave to Am. Compl. ("Pl.'s Mot. for Leave"), Doc. 8, #89). He submitted the proposed amended pleading with that motion. (*See* Prop. Am. Compl., Doc. 9, #92–109). The motion itself is three sentences long. As grounds for leave, it states that "justice requires that Plaintiff be given an opportunity to correct any defects in their [sic] original Complaint." (Doc. 8, at #89).

The proposed amended complaint largely restates the allegations in the initial Complaint, but does offer a few clarifications regarding the May 23, 2018 meeting and its aftermath. (*See* Prop. Am. Compl. at ¶ 56, #102). For example, instead of alleging that Mason "falsely described" Green's conduct to Gantt and Bergenske, Green now alleges that Mason "knowingly falsely described" the conduct. (*Compare id.* at ¶¶ 43–51, #99-101, *with* Compl. at ¶¶ 44, 45, #9). In addition, Green now contends not only that Gantt and Bergenske "falsely accused" Green of "violations" of Shriner regulations, but that they "should have or knew" that they did so. (*Compare* Prop. Am. Compl. at ¶ 52, #101, *with* Prop. Am. Compl. at ¶ 52, #11). Green also alleges more about the contents of Mason's allegedly disparaging comments to Gantt and Bergenske about Green. In particular, he basically paraphrases the statements that Gantt and Bergenske made to Green in their email, and alleges that Mason first made those statements to Gantt and Bergenske. (Prop. Am. Compl. at ¶ 56, #102). Green further alleges that Mason made the statements to Gantt and Bergenske "at Tampa, Florida in the presence of people" who understood what and who Mason was

talking about and that those people "reasonably understood" the comments to mean Green was responsible for the dire straits of the Cincinnati Hospital. (*Id.*).

Finally, Green expands somewhat on Gantt and Bergenske's alleged motive for attacking him. In the original complaint, he alleged that the motive arose from Green having received information about various alleged wrongdoings within the Shriner's organization. (Compl. at ¶ 56.D, #12). For example, he allegedly learned that certain Shriners had allegedly diverted some $77,000,000 in funds earmarked for the Shriners Hospital for Children in Cincinnati to Shriners Hospitals for Children more generally, which Green alleges may have violated the Internal Revenue Code. (*Id.*). In the proposed Amended Complaint, in addition to restating all such allegations from the original Complaint, Green also states that he had "received information" that Bergenske and Gantt themselves "were using funds from Shriners Hospitals for Children while conducting activities in their roles as Divan members of Shriner's International, Inc., which included hundreds of thousands of dollars for expense accounts for themselves and their spouses." (Prop. Am. Compl. at ¶ 57.E, #103).

Beyond these additional factual allegations, the other principal change in the Amended Complaint is that Green now declines to reassert his intentional infliction of emotional distress and retaliation claims. (*See id.* at ¶¶ 58–80, #104–08).

Defendants all oppose granting Green leave to amend his complaint. (*See* Defs.' Bergenske and Gantt's Mem. in Opp'n to Pl.'s Mot. for Leave ("B&G's Opp'n"), Doc. 11, #114–22; Def. Mason's Mot. in Opp'n to Pls. Mot. to Am. the Compl. ("Mason's Opp'n"), Doc. 10, #110–13). Bergenske and Gantt argue the proposed amended

complaint did "not remedy the defects" of the initial complaint and that granting leave to amend "would be an exercise in futility." (B&G's Opp'n at #114). That is so, they explain, because, even as amended, Green's slander and false light claims still fail as there is nothing in the proposed pleading that indicates that the common interest privilege does not apply, that there was publication, or that the statements are actionable in the first place. (*Id.* at #116–19). They also argue the remaining "infliction of negligent emotional distress" claim falters because Green again failed to allege any factual support for that claim. (*Id.* at #120–21 (quoting Prop. Am. Compl. at #104)).

Mason similarly argues that the Court should deny Green leave to amend because all the proposed amendments are futile. (*See* Mason's Mot. in Opp'n at #111–12 ("The Amended Complaint would not resolve the issues that were present in the original action … [and] even were the court to permit said Amended Complaint … the Motion to Dismiss would still prevail.")).

Green filed a combined response to Defendants, again missing his deadline under this Court's rules by roughly a year. (*See* Pl.'s Reply Mem. in Resp. to Defs.' Mot. in Opp'n to Pl.'s Mot. for Leave to Am. the Compl. ("Pl.'s Reply"), Doc. 15, #163–68). Green argues that the new allegations make clear the "common interest privilege is inapplicable." (*Id.* at #164). He further argues that the common interest privilege is inapplicable "when the facts in the statement [letter] has [sic] nothing to do with the common interest of anyone other than the defendants in this case." (*Id.* at #165). As for whether the statements are actionable, Green reiterates that, "as pleaded in …

12

paragraphs 43 to 52" of the proposed amended complaint, the letter and "statements made during the Board of Governors meeting … were highly offensive and actionable." (*Id.*). Adding to the actionability argument, Green states the Defendants alleged statements were "actionable statements of fact," not opinions. (*Id.* at #166).

As for the negligent infliction of emotional distress claim, Green argues that he "witnessed" the Defendants' "offensive, unreasonable and … objectionable publicity" that caused him "humiliation" and "ruin[ed] his reputation." (*Id.* at #167). Green maintains that it was those statements that "were made to known people outside the Board or Trust," and destroyed his reputation. He also maintains they "shock[ed]" him and subjected him to "real physical peril" of some unknown sort. (*Id.*). These arguments largely rehash his response to the motions to dismiss and do not identify any substantive changes in the proposed amended pleading.

## LAW AND ANALYSIS

Both motions to dismiss, as well as Green's motion for leave to amend, are currently pending before the Court. The Court addresses each, starting with Green's motion for leave.

### A. The Court Grants Green's Motion For Leave To Amend His Complaint.

There are three ways a party may amend a pleading: as a matter of course, with the opposing party's written consent, or with leave of the Court. *See* Fed. R. Civ. P. 15(a)(1)–(2). As to the first, a plaintiff may amend once as a matter of course, but must do so within 21 days after the defendant files an answer or motion under Rule

12(b). Green missed this window of opportunity. That left Green with two options: he could either secure consent or move for leave. Green chose the latter.

When a party moves for leave, as Green has done here, a district court is afforded broad discretion in deciding whether to grant it. *See, e.g.*, *Cheryl & Co. v. Krueger*, No. 2:18-cv-1485, 2019 WL 7821056, at *1, (S.D. Ohio Dec. 12, 2019) (citing *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). That being said, Federal Rule of Civil Procedure 15(a)(2) governs such motions, and it instructs that leave should be "freely" granted "when justice so requires." A district court's "outright refusal to grant the leave without any justifying reason … is not an exercise of discretion," but instead an abuse of it that is "inconsistent with the spirit of the Federal Rules." *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962). That general rule governs absent "any apparent or declared reason [for denying leave]—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies … undue prejudice to the opposing party … futility of the amendment, etc." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman*, 371 U.S. at 182).

One reason a court may exercise its discretion and deny a request for leave, though, is if the proposed amended pleading is futile. Futility arises "if the [claim, even with the] amendment[,] could not withstand a Rule 12(b)(6) motion to dismiss." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman*, 371 U.S. at 182); *see also Parchman*, 896 F.3d at 737–38 (same); *Midkiff v. Adams Cty. Reg'l*

*Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (denying leave to amend when the proposed amended pleading consisted of conclusory allegations without factual support).

Here, although Green missed the deadline for seeking leave to amend, he nonetheless filed early in the case. Moreover, his proposed amendment does not change the nature of the case, but rather just clarifies the allegations that he had already made in his original complaint. Indeed, by dropping two of the counts (retaliation and intentional infliction), Green's proposed amendment narrows the issues in this case. And the additional content he added to his allegations for the remaining three counts does not meaningfully impact the arguments that Defendants mount in their respective motions to dismiss, or undercut the Court's ability to consider those arguments here. Accordingly, the Court **GRANTS** Green's motion to amend.

There is then the separate question of what impact granting that motion has on the Court's ability to consider the pending motions to dismiss. As a general matter, an "amended complaint supersedes the original complaint, thus making the motion to dismiss the original complaint moot." *Ky. Press Ass'n, Inc. v. Ky.*, 355 F. Supp. 2d 853, 857 (E.D. Ky. 2005) (citing *Parry v. Mohawk Motors of Mich.*, Inc., 236 F.3d 299, 306 (6th Cir.2000) (holding that the amended complaint supersedes all previous complaints and becomes the operative pleading)). *See also Glass v. The Kellogg Co.*, 252 F.R.D. 367, 368 (W.D. Mich. 2008) ("Because the original complaint has been superseded and nullified, there is no longer a live dispute about the propriety or merit

15

of the claims asserted therein; therefore, any motion to dismiss such claims is moot.") (collecting cases).

At the same time, "[i]f some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance." *Yates v. Applied Performance Techs., Inc.*, 205 F.R.D. 497, 499 (S.D. Ohio 2002) (citations omitted). That is particularly true where the amended complaint is "substantially identical to the original complaint." *Mandali v. Clark*, No. 2:13–cv–1210, 2014 WL 5089423 at *2 (S.D. Ohio Oct. 9, 2014) (citations omitted).

Here, the Court determines that there is no reason "to exalt form over substance" and force the Defendants to re-file new motions to dismiss. The Amended Complaint is largely identical to the original Complaint, merely fleshing out in a little greater detail some of the allegations, but not in any way changing the thrust of the Complaint. Thus, the Court will "consider the motion[s] as being addressed to the amended pleading." *Yates*, 205 F.R.D. at 499. Moreover, the Court will also consider Defendants' arguments as to why the amendments are futile, which the Court will treat as arguments for dismissal of those claims. Finally, because the Amended Complaint does not include claims for "infliction of intentional emotional distress" or "retaliation," the Court determines that Green is no longer asserting those claims, and thus the Court need not, and will not, consider those claims in connection with its resolution of those pending motions to dismiss. *See, e.g.*, *Barbourville Diagnostic Imaging Ctr. v. Philips Med. Sys., Inc.*, No. 12-191-GFVT, 2013 WL 4459860 at *3

(E.D. Ky. Aug. 16, 2013) ("Because Barbourville Diagnostic has decided not to include that claim in its Amended Complaint it has essentially abandoned that claim and thus review of it is unnecessary.").

With the scope of the case thus defined, the Court now turns its attention to Defendants' motions to dismiss the three remaining claims on the merits.

**B.     The Court Construes Defendant Mason's and Defendants' Gantt and Bergenske's Motions To Dismiss As Directed At The Amended Complaint, And Grants Them As So Construed.**

### 1.     *Legal Standard.*

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Green] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that assessment, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is true, however, only as to factual allegations. The Court need not accept as true Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face."

17

*Iqbal*, 556, U.S. at 678; *Twombly*, 550 U.S. at 546-47). Under the *Twombly/Iqbal* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims.

> **2.  *Green's Factual Allegations, Even As Amended, Do Not Give Rise To A Plausible Claim For Negligent Infliction of Emotional Distress, Slander or False Light.***

Before turning to the merits of Defendants' arguments and Green's response, there is a threshold issue to address. The parties all appear to be operating under a shared, but tacit, assumption that Ohio law governs this action. That assumption is correct, but warrants some minor explanation. This action is before the Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332(a). Accordingly, the Court applies Ohio's choice of laws rules. *See Charash v. Oberlin College*, 14 F.3d 291, 296 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)) ("It is well-settled that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits."). The Ohio Supreme Court has stated more than once that it follows § 145 of the Restatement (Second) of Conflict of Laws to resolve such issues. *See, e.g.*, *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286 (Ohio 1984) (per curiam). The relevant portion of the restatement sets forth a "most significant

relationship" standard, which states that the Court should apply the law of the state with the closest ties to the dispute and the parties.[4]

Here, the relevant factors overwhelmingly point to Ohio. The injury occurred in this State, as did the principal conduct at issue in the case. The matter arose out of a relationship centered in this State and Green, the plaintiff, is domiciled here. In any event, all parties appear to agree that Ohio law applies, and thus have waived

---

[4] Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
  (a) the place where the injury occurred,
  (b) the place where the conduct causing the injury occurred,
  (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
  (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 6 states:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of applicable rule of law include
  (a) the needs of the interstate and international systems,
  (b) the relevant policies of the forum,
  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
  (d) the protection of justified expectations,
  (e) the basic policies underlying the particular field of law,
  (f) certainty, predictability and uniformity of result and
  (g) ease in determination and application of the law to be applied.

any argument to the contrary. Thus, both as a result of the Court's own analysis, and the parties' shared assumption on the issue, the Court will apply Ohio law to the three remaining claims set forth in Green's Amended Complaint: (1) negligent infliction of emotional distress; (2) false light; and (3) slander. For reasons further elaborated below, while the Court starts with negligent infliction of emotional distress, it next moves to slander before addressing false light.

### a. Green Fails To Plausibly Allege A Claim For Negligent Infliction of Emotional Distress.

Under Ohio law, a prima facie case for negligent infliction of emotional distress requires that "(1) the plaintiff witnessed and/or experienced a real or impending danger to another, (2) the defendant's conduct negligently caused the dangerous incident, and (3) the defendant's conduct was the proximate cause of plaintiff's serious and reasonably foreseeable emotional distress." *David v. Matter*, 96 N.E.3d 1012, 1017 (citing *High v. Howard*, 592 N.E.2d 818, 820-21 (Ohio 1992), *overruled on other grounds in Gallimore v. Children's Hosp. Med. Cent.*, 617 N.E.2d 1052, 1060 (Ohio 1993)). "This tort is generally asserted by a bystander because she witnessed another person in danger and the defendant was unaware of the presence of the bystander." *Id.* (emphasis added). As relevant here, the first element actually consists of three sub-elements: (1) a threat of harm or danger, (2) to another, (3) that the plaintiff witnessed. *See id.*

Green goes 0 for 3 on these sub-elements. He does not allege any conduct by Defendants that resulted in any alleged threat of physical harm or danger, to any identified third person, that Green witnessed.

20

To be sure, the Ohio Supreme Court has noted that the first prong of the tort may extend to situations where the plaintiff is "in fear of physical consequences to his own person." *High*, 592 N.E.2d at 820-21; *see also Loudin v. Radiology & Imaging Servs., Inc.*, 924 N.E.2d 433, 453 (Ohio Ct. App. 2009) (quoting *High*, 592 N.E.2d at 820-21). But that offers no help to Green here. He does not plausibly allege any physical harm to himself that may arise as a consequence of the statements at issue.[5]

In short, Green has not plausibly alleged the necessary elements for a negligent infliction of emotional distress claim, and thus that claim fails as a matter of law.[6]

---

[5] Green does, however, assert in his reply in support of his Motion for Leave that Defendants' statements subjected him to "real physical danger." (Pl.'s Reply at #166-67). Green does not specify what that danger is, but he seems to suggest that his "shock" at these statements is, in itself, a physical danger. That doesn't work. First, arguments in a reply are not allegations in a complaint, and Green neglected to include any allegation of "physical danger" in either his original or amended complaint. Moreover, even had he done so, he still fails to plead *facts* plausibly suggesting that he was ever in any *physical* danger.

[6] While Green labels his cause of action "Infliction of Negligent Emotional Distress," (Am. Compl. at ¶ 58, #104), and alleges that the Defendants "engaged in negligent conduct," (*id.* at ¶ 59, #104), other allegations in that cause of action appear to include elements of his now-dropped intentional infliction claim. (*See, e.g., id.* at ¶ 61, #104 (referring to "extreme and outrageous conduct")). To the extent Green mislabeled his claim, and instead intends to pursue a claim for intentional infliction, he comes nowhere close to alleging the type of extreme and outrageous conduct necessary to support such a claim. As one recent Ohio appeal court put it: "Extreme and outrageous conduct is described as so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability for conduct alleged to be extreme and outrageous clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Speller v. Toledo Pub. Sch. Bd. of Educ.*, 98 N.E.3d 1066, 1075 (Ohio Ct. App. 2017). Characterizing someone as "not a team player" falls comfortably within the listed types of non-actionable statements.

### b. Green Fails To Plausibly Allege A Viable Claim For Defamation.

"Defamation is a false publication that injures a person's reputation." *Fisher v. Ahmed*, 153 N.E.3d 612, 624 (Ohio Ct. App. 2020) (citation and quotation omitted). There are two types of defamation, slander and libel; the former is spoken, the latter is written. *See id.* The prima facie requirements for both are: (1) a false statement of fact, (2) that was defamatory, (3) that was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite intent in publishing the statement. *See id.* (citing *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012)). "'It is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not.'" *Am. Chem. Soc.*, 978 N.E.2d at 853 (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 669 (Ohio 1983)), *abrogated on other grounds*, *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007) (recognizing false light as a tort independent from defamation)); *Webber v. Ohio Dep't of Pub. Safety*, 103 N.E.3d 283, 296 (Ohio Ct. App. 2017) (same).

In terms of the publishing element, "[p]ublication … is a word of art, which includes any communication by the defendant to a third person." *Welling*, 866 N.E.2d at 1057. "[T]he publication requirement for defamation … only requires communication to a third party." *Byrne v. Univ. Hosp.*, 2011-Ohio-4110, 2011 WL 3630483, at *7 (Ohio Ct. App. Aug. 18, 2011).

Even if all five elements of the tort are present, though, a defamation claim still may fail. In particular, a given defendant may be able to invoke a "qualified

privilege" that prevents recovery for defamation. *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975). One scenario which gives rise to such a privilege is when a publication "is fairly made by a person in discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." *Id.* (quotation omitted). This "qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Id.*

A qualified privilege based on a "common interest" often arises in the context of an employment setting. Ohio law holds, for example, that "[g]enerally, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 467 (Ohio Ct. App. 2016) (quoting *Kanjuka v. Metrohealth Med. Ctr.*, 783 N.E.2d 920, 931 (Ohio Ct. App. 2002)). But the "common interest" can be broader than that. Of particular importance here, "[t]his qualified privilege extends to fraternal and social organizations." *Kontar v. American Geophysical Union*, No. 3:15 CV 425, 2017 WL 4512480, *2 (N.D. Ohio June 5, 2017) (citing *McPeek v. Leetonia Italian Am. Club*, 882 N.E.2d 450, 453 (Ohio Ct. App. 2007)). And while the privilege does not extend to all statements, it covers any "communication … reasonably calculated to protect or further [the shared interest]." *Hahn*, 331 N.E.2d at 718 (quoting 50 Am. Jur. 2d 698, Libel & Slander, § 195). Consistent with that, "[t]he elements necessary to establish the privilege are good faith, an interest to be upheld, a statement limited

23

in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Kanjuka*, 783 N.E.2d at 931 (internal quotations omitted).

One important qualification remains. A plaintiff can overcome a qualified privilege, such as the common interest privilege, if he shows "actual malice," which consists of "clear and convincing evidence that the defendant published the statement at issue with knowledge that it was false or with reckless disregard for its truth or falsity." *Id*.

With that as the substantive legal backdrop, there is the separate issue of what is required at the pleading stage, both in terms of the elements, and in the face of a qualified privilege defense. As to the latter, some Ohio courts appear to hold that a mere allegation that a defendant acted with "malice" or with knowledge of the statement's falsity is enough to survive a motion to dismiss. *See, e.g.*, *Mangelluzzi v. Morley*, 40 N.E.3d 588, 597 (Ohio Ct. App. 2015) ("Here, even assuming that a qualified privilege attached to the communications published to the governmental entities identified in the complaint, the complaint pled that the [defendants] acted with 'malice.'"); *Denlinger v. City of Columbus*, No. 00AP-315, 2000 WL 1803923, at *9 (Ohio Ct. App. Dec. 7, 2000) (holding a complaint that alleges statements were made "with knowledge or [sic] their falsity, or with reckless disregard as to their truth" did not entitle defendants to dismissal based on the qualified privilege).

But, pleading standards in federal court are a matter of procedure, not substance. Thus, while *Erie* calls for the Court to apply Ohio's *substantive* law to this diversity action, pleading requirements remain governed by federal law. *See, e.g.,*

24

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259 (11th Cir. 2015) ("[W]hen federal courts are sitting in diversity or pendent jurisdiction only substantive state law must be applied, while federal law governs matters of procedure.") (internal quotations omitted); *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 816 (S.D. Ohio 2007) ("While state law governs the burden of proving fraud at trial in a diversity action, the procedure for pleading fraud is governed by the pleading requirements of Rule 9(b)."). Under federal pleading requirements, a complaint asserting a defamation claim as to which the actual malice standard applies must "set forth facts establishing [that the] statements [were] made with malice" to avoid dismissal. *Carovac v. Lake Cnty. Bd. of Dev.'l Disabilities/Deepwood*, No. 1:19-cv-2344, 2020 WL 5423966, *5 (N.D. Ohio Sept. 9, 2020); *see also, e.g., Hengjun Chao v. Mount Sinai Hosp.*, 476 Fed. App'x 892, 895 (2d Cir. 2012) (dismissing defamation claim where plaintiff failed to allege facts supporting plausible inference of malice).

Using that legal framework, the Court addresses each of Defendants' three arguments for dismissal of the defamation claim: (1) lack of publication; (2) privilege; and (3) lack of a defamatory statement. The Court takes them in that order.

On the publication front, Green alleges that Mason made defamatory oral comments about him to Bergenske and Gantt. That allegation appears to satisfy the pleading standard for slander as to Mason (subject to the common interest privilege discussion below). And, as for Bergenske and Gantt, in paragraph 75 of his Amended Complaint, Green says that all three of the Defendants "in the presence and hearing

of hospital staff and officers like employees at Shriners Hospital for Children of Cincinnati … wrote or spoke words" that were allegedly defamatory. While a bit thin, that at least arguably suffices to allege the third-party publication requirement.

But, while helping on the publication front, those same allegations give rise to a common interest privilege problem. The statements that Mason made to Bergenske and Gantt that were allegedly slanderous (*see* Compl. at ¶¶ 43–51, #9–11) all occurred among members of the same fraternal organization (the Shriners) and related to their common interest in that organization (managing the hospital). (*See* Compl. Ex. C ("Removal Letter"), Doc. 1-3, #23–24). To be sure, Green also points to statements that Defendants allegedly made in the presence of other people, but, as clarified in the Amended Complaint, those other people appear to be staff, officers, and employees at the Cincinnati Hospital that the Shriners run, and the alleged statements all concern hospital operations. (Am. Compl. at ¶ 75, #107). Thus, all of the alleged statements fall squarely within the "common interest privilege."

To overcome that privilege at the pleading stage then, Green must allege that Defendants acted with actual malice, and also must allege sufficient facts to make that allegation of malice plausible. He clears the first hurdle, but trips on the second. In his Amended Complaint, Green expressly alleges that "[s]aid words were spoken with malice." (Am. Compl. at ¶ 79, #107). But, while that general allegation might cut it in Ohio state court, it does not work in federal court. Rather, under *Twombly and Iqbal*, Green must support that allegation by pleading facts that create a plausible inference that the Defendants acted with malice.

26

As noted, in the defamation context, "malice" means actual knowledge of falsity, or at the very least a reckless disregard for the truth. Thus, Green's allegations about the Defendants' alleged motive (their alleged desire to discredit Green because of damaging information Green allegedly had about them) does little to assist on this front. As for "actual knowledge," though, Green's allegations show that is *not* the case, at least as to Bergenske and Gantt. In particular, Green asserts that the two made their statements "without any direct knowledge of the conduct of Green." (*See* Am. Compl. at ¶ 53, #101). Indeed, Green states time and again in his Amended Complaint that "Defendants Gantt and Bergenske had no personal knowledge" of his alleged misconduct (or lack thereof). (*See id*. at ¶¶ 43–51, #99-101). Rather, he says, the problem is that the two "relied negligently upon representations of Defendant Mason and Imperial Divan members." (*See id*. at ¶ 53, #101). But the Ohio Supreme Court has made clear that "[m]ere negligence is not enough to establish actual malice." *Dale v. Ohio Civil Serv. Emp. Ass'n*, 567 N.E.2d 253, 258 (Ohio 1991). Because Green specifically alleges that Gantt and Bergenske had no personal knowledge, but instead "relied negligently" on Mason, Green has failed to allege facts supporting his assertion of "actual malice" on their part, and thus has failed to create a plausible inference that their alleged statements fall outside the common interest privilege. Without such factual allegations, his defamation claim against the two of them fails as a matter of law.

That leaves Mason. Green alleges that Mason had actual knowledge of the falsity of various statements that he made to Gantt and Bergenske. And other

allegations in the Amended Complaint appear to show that Mason directly observed Green, or interacted with him, in connection with the matters at issue. It is thus at least plausible that Mason's statements about Green's conduct, if in fact false, were knowingly so. The allegations of knowing falsity thus create the plausible inference of actual malice needed to overcome the common interest privilege at the pleading stage at to Mason.

But that is not the end of the story. Defendants also argue that Green has failed to adequately allege a defamatory statement. As noted, under Ohio law, the question of whether a given statement is defamatory is a matter of law for the Court. *Am. Chem. Soc.*, 978 N.E.2d at 853. If Green has not alleged a defamatory statement, that is an independent basis on which his claim would fail.

In Ohio, "[a]ctionable defamation falls into one of two categories: defamation per se or defamation per quod." *McClure v. Ohio Dept. of Rehab. And Corr.*, No. 19AP-535, 2020 WL 1320713, at *2 (Ohio Ct. App. Mar. 19, 2020). As to the former, damages are assumed, but as to the latter, a plaintiff must plead, and ultimately prove, "special damages" which are "direct financial losses resulting from the plaintiff's impaired reputation." *Id*; *see also, e.g., Dudee v. Philpot*, 133 N.E.3d 590, 604 (Ohio Ct. App. 2019) ("In an action for defamation per quod, special damages must be pled and proven.").

Defamation per se under Ohio law is limited to statements that "fit within one of four classes: (1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious

28

disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; and (4) in cases of libel only, the words tend to subject a person to public hatred, ridicule or contempt." *McClure,* 2020 WL 1320713, at *2; *see also, e.g., Dudee*, 133 N.E.3d at 604 (listing the first three categories above as those applicable to defamation per se for oral statements).

Let's see how Mason's alleged statements stack up. According to the Amended Complaint, Mason's statements consist of the same substance as the statements that appeared in the letter that Gantt and Bergenske emailed to Green. In fact, as noted above, Green alleges that Mason falsely described Green's conduct to Gantt and Bergenske, who then "negligently relied" on Mason's statements by repeating the statements in their letter to him. Those statements consist of assertions that Green was "disrespectful," was "unable to work as a team member," failed to "accept[] personal responsibility to remain informed on important and critical issues affecting the Cincinnati hospital," and other statements of that ilk. (*See* Am. Compl. at ¶ 74, #106).

Those certainly do not accuse Green of an indictable offense involving moral turpitude, or a contagious disease, and thus do not fall into either of the first two categories. As for the third category, Green makes a bald allegation that the statements injured his "professional reputation." (*See* Am. Compl. at ¶ 80, #107–08). But once again, he pleads no actual facts suggesting that (or how) this translated into an injury in his "trade or occupation" (e.g., any lost business). Nor is it particularly surprising that he did not do so, as his involvement on this Board was as a volunteer,

29

and in his capacity as a Shriner, and thus any involvement with his trade or occupation (as an attorney) was likely incidental at best. And, in any event, in *Dudee*, 133 N.E.3d at 604, the Ohio appeals court found that an allegation that an allegedly libelous statement had hurt the plaintiff's "reputation" was not enough to give rise to a defamation per se claim, necessarily implying that free-standing reputational harm alone is not enough to constitute an injury to the plaintiff "in his trade or occupation."

To be sure, Green does allege that the statements exposed him to "ridicule," (*see* Am. Compl. at ¶ 78, #107), which is included in the fourth category of defamation per se, but that gives rise to a separate problem. Ohio law is clear that the "ridicule" category is limited to written words only (i.e., cases of libel, not slander). *Dudee*, 133 N.E.3d at 604 (noting that statements that subject the plaintiff to ridicule or damages his reputation cannot give rise to a libel-defamation-per-se claim). And there are reasons for that. Harsh words are often spontaneously exclaimed out of anger or spite, but they tend to be fleeting. Written words, on the other hand, are usually prepared with more care (although email and text messaging are perhaps rendering that assumption more questionable than it once was) and tend to be more durable. Thus it is not surprising that Ohio law treats written words of contempt, for example, more harshly than spoken words of that nature. But, at the end of the day, the wisdom of that distinction is not for this Court to decide. In this diversity case, it is enough to know that Ohio law makes that distinction, limiting the fourth category to written words.

That distinction matters here. Green says in passing that the Defendants "wrote or spoke" the offending words (*id*. at ¶ 75, #107), but the allegations in the Amended Complaint directed at Mason point only to *spoken* words. In fact, Green has failed to identify a single *written* publication that Mason allegedly authored or distributed, and he is not responsible for writings published by others. *See Hahn*, 331 N.E.2d at 718 ("In an action for defamation, the plaintiff's prima facie case is made out when he has established a publication to a third person *for which defendant is responsible*, the recipient's understanding of the defamatory meaning, and its actionable character.") (emphasis added). Indeed, even as to Bergenske and Gantt, the only written publication Green identifies is the letter, which was sent only to him (and thus was not "published"). *See Rosado-Rodriquez v. Nemenz Lincoln Knolls Mkt.*, --- N.E.3d ----, 2020 WL 5948918 at *6 (Ohio Ct. App. Sept. 28, 2020) ("Publication of a defamatory statement consists of communicating the statement to a person or persons other than the person who is the subject of the statement.") (citing *Hahn*, 331 N.E.2d 713). In fairness, Green does refer at one point to the "records of Shriners International," and alleges that the information could be "found in public records" and "via internet searches." But he does not allege any supporting facts even explaining what those allegations mean, let alone rendering them plausible or providing fair notice to the Defendants of the nature of these assertions.

Absent a plausibly alleged published writing, the sole basis for the defamation claim seems to be slander (which, after all, is what Green labeled his defamation claim), rather than libel. (*See* Am. Compl. at ¶ 73, #106). But, as to slander claims,

the fourth category—i.e., the only category that includes reference to the "ridicule" that he alleges—is not available. As Green does not allege that any of the other three categories apply, and does not plausibly allege a written publication (especially as to Mason, but actually as to Gantt or Bergenske either), he has failed to state a valid defamation per se claim.

In fact, even if the fourth category did apply to spoken words, his claim still would fail as a matter of law. "Public hatred, ridicule, or contempt" describes a relatively high standard, and rightly so. Difficult situations and hard feelings often arise, particularly in situations involving things—like charitable hospitals for children, for example—about which people may be passionate. Poorly chosen words may fly when facing momentous decisions in such settings. Setting a high bar for defamation ensures that the normal slights of daily living—even those that arise in fraught situations and thus may be strongly worded—do not become the common grist of lawsuits. As just one example, if referees could sue coaches for every excited utterance that could be understood as "ridiculing" a referee by questioning his or her professional competence, defamation suits would abound.

With that in mind, take a closer look at what Green alleges in his Amended Complaint. In a business setting, he was characterized: (1) as "disrespectful" to other Board members; (2) as unable to work as a team player; (3) as "disregard[ing] the directions from the Chairman"; (4) as making "misrepresentations of the By-laws and the Hospital Rules and Regulations"; (5) as not "remain[ing] informed on important and critical issues"; (6) as "engaging in unauthorized meetings" with hospital staff;

(7) as "lobbying staff members for support of an ill-conceived plan"; (8) as improperly reaching out to McKinsey in support of that plan; (9) and as violating his responsibility to the Board "for efficient management and operations of [the] Hospital." (Am. Compl. at ¶¶ 43–51, #99-101). Whether considered alone or in conjunction, such statements are not the stuff of "public hatred, ridicule, or contempt." The Court does not question that Green took offense at what was said, and perhaps rightly so, but the Court nonetheless concludes that the statements, as Green describes them, do not rise to the level of "public hatred, ridicule, or contempt." Not even close.

At most, then, Green's claim would be one for defamation per quod. But that does not work either. To start, defamation per quod arises when a statement is somewhat ambiguous, but could be understood in a defamatory fashion. *Becker v. Toulmin*, 138 N.E.2d 391, 397 (Ohio 1956). For the reasons already discussed above, it is doubtful that the statements alleged here, even if interpreted harshly, would be sufficient to satisfy the threshold for defamation.

But put that to the side for a moment, as there is a related problem. To be defamatory, a statement must be "false," which in turn means it must be falsifiable. The vast majority of the statements alleged here (e.g., that Green was disrespectful, or disregarded instructions, or was not a team player) are not falsifiable in any meaningful sense. How would one prove that Green was or was not "disrespectful"? That term, like "beauty," is often in the eye of the beholder. And the question of whether a given plan is "ill-conceived" or "brilliant" is often more a matter of

33

subjective impression than objective certainty. On many, if not most, difficult decisions, as the old saying goes, one person's meat is another's poison. Characterizations like "ill-conceived" lack the essential true/false dichotomy needed to establish a claim for defamation. To be sure, some of the statements do include assertions of fact—the Green sent an email to the consultant, or spoke (i.e., lobbied) staff about potential plans. But Green does not dispute those factual assertions. He admits he sent the email (indeed, he attaches it to his Amended Complaint), and does not deny that he spoke with staff, but only resists the characterization of those conversations as "lobbying." Again, though, that just highlights the problem.

Finally, even putting all of that aside, there is yet a further problem. To pursue a defamation per quod claim, a plaintiff must allege "special damages," which are "direct financial losses resulting from the plaintiff's impaired reputation." *McClure*, 2020 WL 1320713, at ¶ 13. Green has not plausibly alleged *any* direct financial losses he suffered as a result of the alleged defamation.

For all of these reasons, whether construed as a claim for defamation per se, or a claim for defamation per quod, Green's defamation claim fails as a matter of law.

### c. Green Fails To Plausibly Allege A Claim For False Light.

That leaves the false light claim. False light and defamation are distinct, but related, causes of action. Under Ohio law, the tort of false light subjects a defendant to liability for invasion of privacy if (1) "the false light in which the other was placed would be highly offensive to the reasonable person," and (2) "the actor had knowledge or acted with reckless disregard as to the falsity of the publicized matter and the false

light in which the other would be placed." *Welling*, 866 N.E.2d at 1059. Adopting the Restatement (Second) of Torts definition for false-light invasion of privacy, the Ohio Supreme Court in *Welling* recognized that "[t]he requirements imposed by the Restatement make a false-light claim difficult to prove." *Id.*

As noted above, false light is related to defamation. "[T]he same core reasons that necessitate dismissal of [a] defamation claim [may] inform disposition of [a] false light invasion of privacy claim," *Croce v. New York Times Co.*, 345 F. Supp. 3d 961, 994 (S.D. Ohio 2018), aff'd, 930 F.3d 787 (6th Cir. 2019) (quoting *Murray v. HuffingtonPost.com, Inc.*, 251 F. Supp.3d 879, 889 (S.D. Ohio 2014)). At the same time, the two torts are not co-extensive, and "under Ohio law a defendant can be liable for false light invasion of privacy even if not liable for defamation." *Id.* (quoting *HuffingtingPost.com*, 251 F. Supp.3d at 889).

There are, however, only two types of cases where that is true. As the court explained in *Croce*, quoting the Ohio Supreme Court on this state law issue:

> "There are scenarios in which false light fits and defamation fails: The first involves cases where the defendant reveals intimate and personal, but false, details of a plaintiff's private life …. The second category encompasses portrayals of the plaintiff in a more positive light than he deserves."

*Croce*, 345 F. Supp.3d at 994 (quoting *Welling*, 866 N.E.2d at 1055 (2007)) (internal quotations omitted). "*Other than these two scenarios, defamation and false light claims are essentially coextensive.*" *Id.* (emphasis added).

Here, Green does not allege any facts bringing his false light claim within either of the two identified scenarios. Thus, just as in *Croce*, "[t]o the extent [Green's] defamation claims are dismissed, his false light claims are dismissed too." *Id*; *see also*

*Hoffman v. O'Malley*, No. 18-cv-309, 2020 WL 1915258, *9 (N.D. Ohio Apr. 20, 2020) (noting that there are "only two categories of False Light claims which extend beyond the borders of Defamation," and dismissing other false light claims "on the basis that the Court dismisses" the defamation claims).

Even apart from that problem, the claim is legally defective in its own right. A false light claim requires that "the information must be 'publicized,' which is different from 'published[.]'" *Welling*, 866 N.E.2d at 1057. "Publicity … means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id*. Something that is publicized "reaches, or is sure to reach, the public." *Id*. (quoting Restatement (Second) of Torts, § 652D, cmt. a).

Green fails to plausibly allege that the statements regarding his status as a Shriner, a member of the Cincinnati Board, or the statements surrounding his removal, were publicized to the extent necessary to sustain a false light claim. Throughout his Amended Complaint, Green reiterates that Mason "knowingly falsely described Plaintiff Green to Defendants Gantt and Bergenske." (Am. Compl. at ¶¶ 43-51, #99-101). This is not "publicizing." Green's allegations against Gantt and Bergenske stem from the fact that they negligently relied on Mason and repeated the information that Mason told them in their letter to Green. (*Id*. at ¶ 53, #101). But a letter to the plaintiff is not "publicizing." And, on May 23, 2018, Defendant Mason allegedly made those same statements to Gantt and Bergenske "in the presence of

people," but reference to an undisclosed number of "people" does not suffice to plausibly allege publicizing.

The closest Green comes is his allegation that the Defendants "published the statements through a community of membership in excess of 2,000 individuals." (*See id.* at ¶ 64, #104-05). But read in context, that does not work either. First, this reference to "community" strongly suggests that all of the recipients may fall within the qualified privilege exception discussed above—they were receiving the information in their "official" capacities as part of their Shriner "duties," and not as members of the "public." And even putting that aside, the Amended Complaint pleads absolutely no facts as to how the statements allegedly were "published … through a community of membership," or even what that actually means. Similarly, the Amended Complaint alleges that the information is "contained in the records of Shriners International," but offers no explanation as to why including the information in the records of a private organization (and one with a reputation for secrecy) would plausibly allege that the information is "public." To be sure, the pleading also baldly asserts that the statements may be "found in public records and [are] available via internet searches," but it offers no factual support to make that allegation plausible. This lone allegation, absent attendant facts (*see* Am. Compl. at ¶ 69, #106), is insufficient under *Twombly*/*Iqbal* to give rise to a plausible allegation that the Defendants "publicized" the information at issue.

\*     \*     \*

None of the above means that individuals like Green, who claim that their reputations were unjustly sullied, are—or should be—without recourse. Norms, customs, even basic rules of manners, all prescribe the boundaries of appropriate communication within a group or organization. Those who exceed these bounds, as Green claims that Defendants did here, often suffer social sanctions, ranging from opprobrium all the way to eviction from the group. And victims of unfair accusations can also avail themselves of self-help remedies in the form of counterspeech. For example, Green claims that he was targeted in an attempt to silence him regarding wrongdoing within the Shriners organization—allegations that, if true, would likely be of interest to others in that organization.  As a general rule, though, courts are loath to assume the role of arbiter for disputes regarding the appropriateness of particular communications in such settings, and rightly so. Tort claims and money damages are blunt instruments for policing such conduct. And litigation of such claims brings with it error costs of its own, especially in the context of close-knit fraternal organizations, which may have shared understandings of the proper limits of social discourse that vary from those commonly employed outside the group. Thus, perhaps not surprisingly, tort claims like those Green asserts here are reserved for egregious cases—statements that are not only untrue, but that are also outrageous or deeply and objectively offensive, or that resulted in specific and identifiable concrete harms. Even reading the allegations favorably to Green, this is not such a case. In short, the bar is set high—intentionally so—and Green fails to clear it here.

## CONCLUSION

Based on the above, the Court **GRANTS** Plaintiff Green's Motion for Leave to Amend (Doc. 8), but **GRANTS** Defendant Mason's Motion to Dismiss (Doc. 5), and **GRANTS** Defendants Gantt and Bergenske's Motion to Dismiss (Doc. 4), which the Court construes as directed to the allegations in the Amended Complaint. As a result, the Court **DISMISSES** the Amended Complaint (Doc. 9) **WITH PREJUDICE**. The Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

November 30, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**